

# Expert witness statement by Andrew Stettner & Rebecca Vallas
## *Bemke et al. vs. Pemachek*
## United States District Court for The Western District of Wisconsin
## July 12, 2022

*Introduction*

We are pleased to offer this expert witness statement in the case of Bemke et al. v. Pechacek concerning discriminatory disqualification of disabled Wisconsin residents from receiving the unemployment benefits they have duly earned upon loss of a job through no fault of their own.

*Summary of Opinions*

- There is a population of Wisconsin SSDI recipients that have earned enough to collect UI benefits and lose a job through no fault of their own. These individuals are disqualified from UI benefits under Wisconsin law solely because of their disability status.
- Title II of Americans with Disabilities Act defines a person with a disability as an individual who has a "physical or mental impairment that substantially limits one or more of the major life activities.[1]" According to the Center for Disease Control, 21.2 percent of Wisconsin residents overall are disabled and protected under the rubric of the Americans with Disabilities Act.
- In contrast to the broad definition of disability in the ADA, eligibility for social security disability benefits is narrow and extremely restrictive. Just 4.8 percent of Wisconsin adults receive SSDI (less than one in four disabled residents in the state). As the SSDI definition is stricter than the ADA, these individuals are protected under the ADA.
- The Social Security Administration actively encourages SSDI recipients to work. Non-blind SSDI recipients are allowed to earn up to $1,350 per month, the amount considered to be "substantial gainful activity." The last National Beneficiary Survey found that 11.5 percent of SSDI beneficiaries do work with average earnings of $832 per month. On average this is enough work effort to qualify for unemployment benefits. Wisconsin's ban on unemployment insurance among those receiving SSDI targets people with disabilities, and deprives them of a weekly benefit amount of $99.84 per week.
- SSDI benefits on their own are not enough to cover the living expenses of Wisconsin beneficiaries, and thus SSDI recipients work to fill in those gaps and pay for basic expenses like transportation, child care and food. SSDI recipients have an urgent need for the income provided by unemployment to continue paying for the basics should they lose their job unexpectedly. The

---

[1] *Americans with Disabilities Act*, 42 U.S. Code § 12132

*tcf.org*

1 Whitehall Street, 15th Floor
New York, New York 10004
212.452.7700

2000 M St NW, Suite 720
Washington, DC 20036

- Social Security Administration does not see UI and SSDI in conflict, and does not reduce SSDI payments among those receiving UI, unlike workers compensation which is counted against SSDI.
- The SSDI program includes numerous incentives to encourage its recipients to work, and Wisconsin's own Department of Vocational Rehabilitation assists SSDI recipients in seeking work. One of these provisions allows individuals to earn about the substantial gainful activity for up to 9 months without losing any benefits. If they are able to work for $18 per hour for 40 hours in a week, they could qualify for more in UI than they could have received in SSDI. SSDI benefits are not a replacement for UI among disabled workers.
- Wisconsin's ban on UI among SSDI recipients undercuts efforts by the Social Security Administration and Wisconsin's Department of Vocational Rehabilitation to increase employment among people with disabilities*.* Over-time, unemployment benefits reward workers who build up a work history and enable continued labor force attachment by filling gaps in income between jobs and encouraging work search.
- In conclusion, we observe that the ban of SSDI recipients receiving UI has no rational basis. The ban runs contrary to the goals of rewarding and incentivizing SSDI beneficiaries to work up to their capacity and explore returning to self-supporting work if and when their health permits. It also runs counter to the goals and protections of the ADA. Furthermore, the ban undermines the function of the state's UI program in helping people maintain ongoing labor force attachment and a stable economy.

***Qualifications***

Mr. Andrew Stettner is a Senior Fellow at the Century Foundation, a 102 year old independent nonpartisan think tank based with offices in New York City and Washington DC. Mr. Stettner is one of the nation's leading experts on unemployment insurance benefits, as evidenced by his election as a member of the National Academy of Social Insurance, the publication of numerous research reports on unemployment insurance benefits, the delivery of Congressional and state legislative testimony, and frequent citations in the media. Before coming to TCF, Mr. Stettner worked for 10 years at the National Employment Law Project where he served as Deputy Director and led the organization's extensive work on unemployment insurance benefits. Mr. Stettner received a Masters in Public Policy at Georgetown University during which time he received on-the-job training at the U.S. Department of Labor's Employment and Training Administration, which has statutory oversight over unemployment insurance.

Ms. Rebecca Vallas is also a Senior Fellow at The Century Foundation, where she leads TCF's work to achieve economic justice for people with disabilities and their families and serves as co-director of the Disability Economic Justice Collaborative. Ms. Vallas joined TCF after seven years at the Center for American Progress, during which time she launched CAP's Disability Justice Initiative—the first disability policy project at a U.S. think tank, and like Mr. Stettner was elected to the National Academy of Social Insurance for which she serves as Secretary of the Board of Directors. Ms. Vallas has written extensively on social security disability benefits, is frequently cited in the media on social security disability benefits, and has been asked by the U.S. Congress for her expertise on these issues including testifying at five

House and Senate hearings on the subject over the years, including a May 2022 U.S. House Ways & Means Committee hearing. Ms. Vallas has a Juris Doctor from University of Virginia and represented disabled and older people in Social Security and other social insurance and public benefits matters for several years as a staff attorney and Skadden Fellow at Community Legal Services in Philadelphia.

*Background on the case*

The case at issue is made by Brian Bemke and seven other named plaintiffs on behalf of themselves and similarly situated Wisconsin residents that are recipients of federal Social Security Disability Insurance (SSDI). The case challenges the blanket disqualification under Wisconsin's unemployment insurance (UI) law at Section 108.04(12)(f), which disqualifies individuals from receiving an unemployment benefit payment in the same month that they receive a disability payment. This ban was initially put into place in 2013 by Wis. Act 36 and later modified by 2015 Wis. Act 334.[2] Plaintiffs assert that this disqualification runs counter to Title II of the Americans with Disabilities Act at 42 U.S. Code § 12132, which states that no "qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the services, programs, or activities of a public entity."[3] The state response focuses on its contention that SSDI recipients "are already receiving significant federal cash benefits," and that these benefits are duplicative.[4] As experts in social security disability insurance and unemployment insurance, we assert that people who receive social security disability insurance are protected by Title II of the Americans with Disabilities Act and that unemployment insurance is a critical earned benefit that is not duplicative of SSDI.

**Wisconsin SSDI recipients who have earned enough to collect UI benefits and lose a job through no fault of their own, but are denied UI benefits under Wisconsin law, are members of a protected class under the ADA.**

The lawsuit at issue is based on the premise that individuals who receive SSDI and who subsequently work, become unemployed, and file for unemployment insurance are covered under the Americans with Disabilities Act (ADA) as disabled people. Title II of Americans with Disabilities Act defines a person with a disability as an individual who has a "physical or mental impairment that substantially limits one or more of the major life activities.[5]" Examples of major life activities include but are not limited to: caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working as well as major bodily functions, including but are not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.[6]

---

[2] "Plain Language Summary of Recent Changes to Wisconsin Unemployment Insurance Law," PDF file, 2015.  https://dwd.wisconsin.gov/uibola/pdf/plainlang2015.pdf
[3] *Americans with Disabilities Act*, 42 U.S. Code § 12132
[4] "Defendant Amy Pechacek's Brief In Opposition To Plaintiffs' Motion For A Preliminary Injunction," Bemke et al. vs. Pemachek, District Court, W.D. Wisconsin, October 4, 2021
[5] *Americans with Disabilities Act*, 42 U.S. Code § 12132
[6] *Americans with Disabilities Act,* 42 U.S. Code § 12102 (2)(a)

The Center for Disease Control finds that 1 in 4 Americans (25.7 percent or 61 million Americans) between the ages of 18-64 have a disability, and this includes 16.6 percent of adults age 18-44, and 28.6 percent of all adults age 45-64.[7] This same study found that 21.9 percent of all people aged 45-64 in Wisconsin have a disability as do 17.1 percent of individuals aged 18-44.[8] This broad definition includes 8.9 percent of Wisconsin adults who have a disability related to mobility, 10.1 percent who have a disability related to cognition, 4.6 percent related to hearing, 3.2 percent related to vision, 2.6 percent related to self-care and 6.2 percent related to independent living.[9] Altogether 21.2 percent of Wisconsin residents overall are protected under the rubric of the Americans with Disabilities Act.

***Wisconsin SSDI recipients are a subset of the overall population of Americans with disabilities, all of whom are covered by the ADA.***

In contrast to the broad definition of disability in the ADA, eligibility for social security disability benefits is narrow and extremely restrictive. The Social Security definition of disability is directly connected to work capacity, including only those individuals who, because of a "physical or mental impairment expected to last at least 12 months or to result in death" are unable to return to any of their past jobs or to do any work that exists in the national economy at a level in which they could do "substantial gainful activity" (SGA)—that is, they could earn $1,350 per month in 2022[10]. According to the Organization for Cooperation and Development (OECD), the Social Security definition of disability utilized by the United States is the most restrictive of all OECD member countries.[11]

Because this definition is so narrow, only a fraction of people with disabilities in the U.S.—and only a fraction of people with disabilities in Wisconsin—are determined to meet the Social Security disability standard and are thus found eligible for disability benefits. Only 4.8 percent of the state's population aged 18-64 have a disability that rises up to this strict definition of disability and thus qualifies to receive SSDI benefits.[12] Those approximately 170,000 residents receiving SSDI benefits thus comprise fewer than one in four of the 21.2 percent of Wisconsin adults who are disabled under the ADA definition of

---

[7] Catherine A. Okoro et al., "Prevalence of Disabilities and Health Care Access by Disability Status and Type Among Adults — United States, 2016," National Library of Medicine, August 17, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6095650/

[8] Center for Disease Control and Prevention, "Disability status and types among adults 18 years of age or older," 2020, https://www.cdc.gov/ncbddd/disabilityandhealth/dhds.html

[9] Some individuals have more than one disability and thus the total of each disability is greater than the prevalence of adults with at least one disability

[10] SGA is equivalent to $1,350 per month in 2022 for non-blind individuals; for blind individuals, the SGA level is $2,260 per month in 2022. Social Security Administration, "Substantial Gainful Activity," https://www.ssa.gov/oact/cola/sga.html.

[11] Rebecca Vallas, Shawn Fremstad, "Social Security Disability Insurance: A Bedrock of Security for American Workers," Center for American Progress, June 16, 2015. https://www.americanprogress.org/article/social-security-disability-insurance-a-bedrock-of-security-for-american-workers/

[12] Kaiser Family Foundation, "Total Disabled Social Security Disability Insurance (SSDI) Beneficiaries, Ages 18-64," 2020, Kaiser Family Foundation

disability and thus protected by the ADA. Assuming 11.4 percent 170,000 adult SSDI recipients work, there are 19,380 individuals singled out because of their disability and denied the right to unemployment benefits they have earned.

All people with disabilities—and all Wisconsinites with disabilities—who have satisfied the rigorous determination by the Social Security Administration that they meet its strict definition of disability are by definition also included in the broader protected class covered by the ADA definition of disability. Working is listed among those daily activities of life covered under the definition of disability in the ADA. To qualify for disability benefits, individuals must be substantially limited in their ability to work. Thus they will all be covered by the ADA as disabled individuals. It is our view that ban on receipt of unemployment benefits is specifically discriminatory against disabled individuals. SSDI recipients are all disabled and are being targeted because of their disability, and being denied a benefit they would otherwise receive if they were not severely disabled enough to have qualified for SSDI.

***SSDI recipients are encouraged by the federal government to test their capacity to work, and the class of UI eligible SSDI recipients are protected by the ADA and are legally entitled to the UI benefits they have earned in the event that they lose a job through no fault of their own.***

As is described further below, both the Social Security Administration and the Wisconsin Division of Vocational Rehabilitation affirmatively encourage SSDI recipients to work up to their capacity and to return to work if they are able to do so.[13] While data on the work activities of Wisconsin SSDI recipients are limited, SSA's National Beneficiary Survey collects such data nationally. The most recent such survey in 2015 found that 11.4 percent of SSDI recipients had worked for pay in the previous year. Among these disabled workers, average monthly earnings were $832.20 per month, with 90 percent working less than 35 hours per week.[14]

The minimum earnings requirement for unemployment insurance benefits in Wisconsin is based on quarterly earnings, and the statute requires at least one quarter with total earnings of $1,350 to qualify for the minimum benefit of $54 per week. SSDI recipients who earned the national average of $832 per month ($2,496 in a quarter) would be eligible to receive $99.84 per week in Wisconsin unemployment benefits. The state calculates UI eligibility as 4 percent of the total wages earned in the highest quarter worked which translates to just over one half of the workers average weekly wage among workers employed for all weeks of that quarter.[15] The minority of workers on SSDI who work do, on average, earn enough to become monetarily eligible for UI benefits. By definition, these workers have a disability that

---

[13] In addition to explicit "work incentives" built into the SSDI program, such as the trial work period, expedited period of reinstatement, etc., entire government programs have been created over the years, such as the Ticket to Work program, with the sole purpose of encouraging and supporting SSDI beneficiaries in returning to work if they are able to do. See, e.g., https://choosework.ssa.gov/.
[14] Social Security Administration, "National Beneficiary Survey," 2018 https://www.ssa.gov/disabilityresearch/nbs.html
[15] Wis Stat § 108.05

has substantially limited their ability to work, but still can work enough to qualify for UI benefits. As disabled individuals monetarily eligible for UI, they represent a class of workers covered by the ADA.

***SSDI recipients who work and lose a job through no fault of their own rely on UI benefits to meet their basic needs, and can potentially qualify for more from Wisconsin unemployment benefits than they would get from SSDI.***

SSDI benefits on their own are meager. While benefits range from $100 to $3,345 per month depending on pre-disability earnings,[16] nearly 90 percent of beneficiaries receive less than $2,000 per month.[17] While the average benefit is $1,358 per month as of December 2021,[18] many beneficiaries receive less. As of June 2020, more than one out of three SSDI recipients received less than $1,000 per month in benefits which is less than the federal poverty guidelines for a family of one.[19] Overall, researchers at the Urban Institute concluded that 31 percent of disability recipients were officially poor, and 13 percent were near poor (less than 125 percent of the poverty line.)[20]

Worth noting, the economic picture for SSDI beneficiaries is even more dire than official federal poverty statistics suggest, given that the federal government's official poverty measure is based on a decades old calculation that does not reflect the necessities of current living.[21] For example, the MIT living wage calculator concluded that the average single person in Milwaukee requires $2,327 per month ($27,928 per year after taxes) to meet basic expenses like food, rent, health care and transportation.[22] Notably, the federal poverty line also does not take into account the additional costs of living with a disability, which can be significant; drawing on four nationally representative surveys, researchers from Stony Brook University, the University of Tennessee, the National Disability Institute, and the Oxford Institute of Population Aging estimate that households with a disabled adult need an average of 28 percent more

---

[16] Melissa Linebaugh, "How Much in Social Security Disability Benefits Can You Get?" NOLO, January 10, 2022,
https://www.nolo.com/legal-encyclopedia/how-much-social-security-disability-ssdi-benefits-can-you-get.html
[17] Social Security Administration, Master Beneficiary Record, June 2020,
https://www.ssa.gov/OACT/ProgData/benefits/da_mbc202006.html
[18] Social Security Administration, Monthly Statistical Snapshot, January 2022,
https://www.ssa.gov/policy/docs/quickfacts/stat_snapshot/2022-01.html.
[19] 2020 Poverty Guidelines, ASPE: U.S. Department of Health and Human Services, 2020,
https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines/prior-hhs-poverty-guidelines-federal-register-references/2020-poverty-guidelines
[20] Kathy Ruffing, "Disability Insurance Provides Vital Benefits to Vulnerable Workers," Center on Budget and Policy Priorities, July 15, 2013,
https://www.cbpp.org/blog/disability-insurance-provides-vital-benefits-to-vulnerable-workers
[21] Shawn Fremstad, "The Defining Down of Economic Deprivation: Why We Need to Reset the Poverty Line," The Century Foundation, September 30, 2020,
https://tcf.org/content/report/defining-economic-deprivation-need-reset-poverty-line/
[22] Living Wage Calculation for Milwaukee County, Wisconsin, accessed July 7, 2022,
https://livingwage.mit.edu/counties/55079

income—an extra $17,690 per year for a typical U.S. household—in order to achieve the same standard of living as a comparable household without a disabled member.[23]

Beneficiaries overwhelmingly spend their monthly benefits on rent, food, copays on needed medications, transportation, utility bills, and other basic living expenses. Because SSDI benefits are so limited, unemployment benefits are critical for those SSDI recipients who supplement their benefits with earnings from work and subsequently lose that job through no fault of their own. On average, Wisconsin unemployment benefits were $332.43 per week in May 2022.[24] That's the equivalent of $1,439 per month, which is in fact more than the national average monthly SSDI payment of $1,358.[25] As described above, disabled workers who perform the average work effort among SSDI recipients, equaling earnings of $832 per month, would qualify for just under $100 per week in UI benefits. That extra roughly $433 per month would be enough to lift the one in three SSDI recipients who receive less than $1,000 per month in SSDI above the official poverty threshold for a single individual. That extra money could be the critical difference between maintaining a roof over their head, food on table, medicines in their cabinet and gas in their car.

Thus, contrary to the state's assertion that the ban on receiving SSDI and UI is in place because SSDI recipients are already receiving government benefits, the combined impact of UI and SSDI is especially important to low-income disabled Wisconsin residents who lose a job through no fault of their own. These SSDI recipients strive to work despite their disability precisely because the benefits are too little to live on. And when they lose a job involuntarily, like all other workers, they need UI benefits to partially replace that lost income.

Indeed there are cases when SSDI recipients might be able to receive more in UI benefits than they could from SSDI. SSDI's trial work period allows individuals to earn an unlimited amount for up to 9 months (and a 2 months grace period) without losing access to SSDI benefits.[26] Thus a subset of SSDI recipients in Wisconsin earn more than the $1,350 per month "substantial gainful activity" or SGA level while continuing to receive SSDI. If they are laid off, these individuals could certainly earn enough to collect the maximum weekly benefit of $370 per week; they would receive $1,600 per month in UI benefits. The full

---

[23] Nanette Goodman et al., "The Extra Costs of Living with a Disability in the U.S. — Resetting the Policy Table," National Disability Institute, October 2020, https://www.nationaldisabilityinstitute.org/reports/extra-costs-living-with-disability/

[24] United States Department of Labor, Monthly Program and Financial Data, May 2022, https://oui.doleta.gov/unemploy/claimssum/5159report.asp

[25] There are 52 weeks in a year, so on average there are 52 divided by 12 or 4.33 weekly UI payments per month on average. In practice, some months include 5 UI payments and some 4 depending on how many Saturdays are in each month, with an average of 4.33.

[26] Rebecca Vallas, Shawn Fremstad, "Social Security Disability Insurance: A Bedrock of Security for American Workers," Center for American Progress, June 16, 2015. https://www.americanprogress.org/article/social-security-disability-insurance-a-bedrock-of-security-for-american-workers/

UI benefit in Wisconsin is thus more than what 75 percent of SSDI beneficiaries receive per month from SSDI.[27]

Qualifying for the maximum weekly UI benefit only requires earnings of $9,250 in the highest quarter, which is roughly $18 per hour for a 40 hour work week. It's definitely possible that an experienced older worker who had received a physical industrial injury might try their hand again in construction or manufacturing and earn this amount of money in today's tight labor market. If these workers lose their jobs, they could qualify for the state's maximum UI benefit and be losing out on more than their disability benefit because of the state's ban.

***Social Security Encourages Disability Beneficiaries to Work***

Social Security Administration policies include strong work incentives and supports with a stated goal of enabling its beneficiaries to test their ability to work as their conditions improve, and when at all possible to move off of SSDI benefits and back into the workforce. This goal represents Congressional intent for the program. In 1999, The Ticket to Work program was enacted into law by a vote of 418 to 2. Representative Rick Lazio, a Republican from New York and an original bill sponsor, asserted that Ticket to Work legislation "has one goal and one goal only: enabling individuals with disabilities to pursue, if they want, work.[28]"

According to SSA, "The Ticket Program and other Work Incentives allow you to keep your benefits while you explore employment, receive vocational rehabilitation services and gain work experience.[29]" Through Ticket to Work, SSA pays local vocational rehabilitation providers to help prepare and place SSDI recipients inwork. The State of Wisconsin Department of Vocational Rehabilitation plays an important role in implementing the Ticket to Work program, and DVR states publicly that it "can help maximize a consumer's earnings and career potential through Social Security work incentive programs like Ticket To Work and Partnership Plus. Staff should remind consumers that there are supports and services available after DVR services end to continue to assist them toward working off benefits.[30]"

Ticket to Work builds on other work incentives within the SSDI program. In all circumstances, beneficiaries are able to earn up to the level that the Social Security Administration considers consistent with being disabled (the aforementioned substantial gainful activity of $1,350 per month). Policy makers recognize that disabled workers need to be able to test their ability to work as their conditions improve,

---

[27] Social Security Administration, Master Beneficiary Record, June 2020, https://www.ssa.gov/OACT/ProgData/benefits/da_mbc202006.html

[28] William R. Morton, "Ticket to Work and Self-Sufficiency Program: Overview and Current Issues," Congressional Research Service, September 13, 2013, https://sgp.fas.org/crs/misc/R41934.pdf

[29] Social Security Administration, "What is the Ticket to Work Program?" Accessed July 7, 2022, https://choosework.ssa.gov/about/

[30] Department of Workforce Development, "Ticket to Work and Partnership Plus for Customers Receiving SSI or SSDI," January 2020,
 https://dwd.wisconsin.gov/dvr/programs/social-security/ss-consumers.htm

without losing the income and health benefits that come with SSDI. For this reason, federal policy allows individuals to earn an unlimited amount for up to 9 months without losing a dollar in benefits during a trial-work period.[31] Those who work above the substantial gainful activity level after the trial work period enter a three-year "extended period of eligibility," during which they receive a benefit only in the months in which they earn less than the substantial gainful activity level.[32] After the extended period of eligibility ends, if at any point in the next five years their condition worsens and they are not able to continue working above that level, they can return to benefits almost immediately through a process called "expedited reinstatement." These policies all work to encourage SSDI recipients to work.

***Wisconsin ban on Unemployment Benefits among SSDI recipients undercuts the efforts by Social Security Administration and Wisconsin's Department of Vocational Rehabilitation to increase employment among the disabled.***

While the state of Wisconsin's brief in this case claims that UI and SSDI are similar government aid programs, they are in fact fundamentally different. SSDI benefits recognize the impact of significant disability on an individual's capacity to complete substantial gainful activity. Wisconsin unemployment insurance benefits are an earned benefit that provide temporary income support to those who are involuntarily unemployed. The Social Security Administration recognizes that UI & SSDI have different purposes and standards. In a memo to other Administrative Law Judges in 2010, SSA's Chief Administrative Law Judge Frank Cristaudo stated that "receipt of unemployment benefits does not preclude the receipt of social security benefits," especially in the context of applications for SSDI benefits.[33] That's in contrast to workers compensation benefits which would cause SSDI benefits to be reduced, because they also relate to disability.[34]

In fact, banning the collection of unemployment benefits, makes it more difficult for SSA and Wisconsin's Department of Vocational Rehabilitation to encourage work. The ability to turn to unemployment benefits provides an additional financial incentive for disabled workers to try on the uncertainties of returning to work while recovering from or managing a disability. That's because they would continue to get at least some of the added financial benefit from working through unemployment compensation between jobs. Named plaintiff Judy Fintz provides an important example of the role of UI, as a temporary benefit that can be claimed through down periods in jobs that are by nature intermittent like retail or food service that go up and down through the year. Ms. Fintz works for a private company that

---

[31] Social Security Administration, Trial Work Period, accessed July 7, 2022, https://www.ssa.gov/oact/cola/twp.html
[32] Social Security Administration, "What You Need to Know About the Trial Work Period," March 11, 2021, https://choosework.ssa.gov/blog/2021-03-11-what-you-need-to-know-about-the-trial-work-period-twp
[33] Chief Judge Frank A. Cristaudo, Receipt of Unemployment Insurance Benefits by Claimant Applying for Disability Benefits, November 15, 2006, https://www.masslegalservices.org/content/memorandum-chief-ssa-administrative-law-judge-cristaudo-ui-availability-ssdi-recipients
[34] Social Security Administration, Frequently Asked Questions, "Will my disability benefits be reduced if I get workers' compensation or other public disability benefits?" February 4, 2022, https://faq.ssa.gov/en-us/Topic/article/KA-01831

provides food services on a college campus that lays its workers off each December, requiring them to rely on UI until school resumes. The existence of UI makes such employment viable for individuals like Ms. Fintz.

Before taking on the risks and responsibilities of going back to work, Wisconsin residents need to know they can count on the income protection of unemployment benefits. This is a practical issue. Many Wisconsin residents would need a working vehicle in order to go back to work. But if they lose a job, they won't have the income needed to maintain their car payments and could put their personal credit and finances at further risk. The temporary payment of UI benefits alleviates that issue, enabling them to continue making their car payments while they are in between jobs, keep their personal credit intact and have a vehicle ready for when they get a new job.

The provision of unemployment benefits between jobs helps to keep workers attached to the workforce, as they are required to search for work in order to continue receiving this aid. Wisconsin UI beneficiaries are required to conduct at least 4 searches per week and to register with the Job Center of Wisconsin, which can require them to participate in reemployment services, including preparing a resume and participating in additional job search activities.[35] This is the most recent iteration of the state's nearly ninety year commitment in its UI law to "to place workers more efficiently and to shorten the periods between jobs."[36] National research demonstrated that these services are cost effective and help workers become reemployed more quickly.[37] Georgetown University researchers further concluded that those receiving more generous unemployment benefits were able to find jobs that are better matched to their education and skills as a result of not only these types of services but the additional time to look for a job that the cash cushion of unemployment compensation provides.[38]

While the main victims of the SSDI/UI ban are the recipients themselves, there are broader consequences. During an economic downturn, the state economy suffers from a decrease in purchasing power and unemployment benefits blunt a recessionary spiral that can result. Wisconsin's UI statute contemplates this role: "The decreased and irregular purchasing power of wage earners in turn vitally affects the livelihood of farmers, merchants and manufacturers, results in a decreased demand for their products, and thus tends partially to paralyze the economic life of the entire state."[39] When UI benefits are capriciously denied benefits to workers that are otherwise eligible, it can play less of a countercyclical

---

[35] Department of Workforce Development, Re-Employment Services (RES), accessed July 7, 2022, https://dwd.wisconsin.gov/det/res/
[36] Wis Stat § 108.01 (2)
[37] Social Programs that Work, "Nevada's Reemployment and Eligibility Assessment Program," May 27, 2020, https://evidencebasedprograms.org/programs/nevadas-reemployment-and-eligibility-assessment-program/
[38] Ammar Farooq et al., "Do Unemployment Insurance Benefits Improve Match Quality? Evidence from Recent U.S. Recessions," Washington Center for Equitable Growth, September 29, 2020 https://equitablegrowth.org/working-papers/do-unemployment-insurance-benefits-improve-match-quality-evidence-from-recent-u-s-recessions/
[39] Wis Stat § 108.01 (1)

role in the economy. According to the US Department of Labor, the percent of jobless Wisconsin workers receiving unemployment insurance dropped from 57 percent in 2009 to 31 percent in 2019. While the social security ban only played a small part in that decline, it nonetheless is an example of the kind of policy that reduces the countercyclical impact of the program.

### *Conclusion*

As disability and unemployment insurance experts, we observe that Wisconsin's ban violates anti-discrimination laws meant to protect the disabiled.  Disabled adults receiving SSDI benefits are a small subset of 21 percent of disabled adults who are disabled under the ADA, and are only 4.8 percent of the adult population.  The minority of SSDI recipients who are able to work do so to meet basic needs like rent, food and transportation that meager SSDI benefits do not provide for. When these workers lose their jobs they have the same need and entitlement to UI benefits to continue paying for those basic expenses. The ban also runs contrary to the goals of rewarding and incentivizing work among SSDI recipients as they manage their condition and look to navigate a life back to working self-sufficiency. Furthermore, the ban undermines the function of the state's UI program in helping people maintain on-going labor force attachment and a stable economy.

**Materials relied on**

*Complaints and Case Material*
"Defendant Amy Pechacek's Brief In Opposition To Plaintiffs' Motion For A Preliminary Injunction," Bemke et al. vs. Pemachek, District Court, W.D. Wisconsin, October 4, 2021

*Legal Materials*
*Americans with Disabilities Act*, 42 U.S. Code § 12132
*Americans with Disabilities Act,* 42 U.S. Code § 12102 (2)(a)
*Wisconsin Unemployment Insurance Law,* Wis Stat § 108.05
*Wisconsin Unemployment Insurance Law,* Wis Stat § 108.01
Chief Judge Frank A. Cristaudo, Receipt of Unemployment Insurance Benefits by Claimant Applying for Disability Benefits, November 15, 2006,
https://www.masslegalservices.org/content/memorandum-chief-ssa-administrative-law-judge-cristaudo-ui-availability-ssdi-recipients

*Documents & Data*
Ammar Farooq et al., "Do Unemployment Insurance Benefits Improve Match Quality? Evidence from Recent U.S. Recessions," Washington Center for Equitable Growth, September 29, 2020
https://equitablegrowth.org/working-papers/do-unemployment-insurance-benefits-improve-match-quality-evidence-from-recent-u-s-recessions/
Catherine A. Okoro et al., "Prevalence of Disabilities and Health Care Access by Disability Status and Type Among Adults — United States, 2016," National Library of Medicine, August 17, 2018,
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6095650/

Center for Disease Control and Prevention, "Disability status and types among adults 18 years of age or older," 2020, https://www.cdc.gov/ncbddd/disabilityandhealth/dhds.html

Department of Workforce Development, Re-Employment Services (RES), accessed July 7, 2022, https://dwd.wisconsin.gov/det/res/

Department of Workforce Development, "Ticket to Work and Partnership Plus for Customers Receiving SSI or SSDI," January 2020, https://dwd.wisconsin.gov/dvr/programs/social-security/ss-consumers.htm

Kaiser Family Foundation, "Total Disabled Social Security Disability Insurance (SSDI) Beneficiaries, Ages 18-64," 2020, Kaiser Family Foundation

Kathy Ruffing, "Disability Insurance Provides Vital Benefits to Vulnerable Workers," Center on Budget and Policy Priorities, July 15, 2013, https://www.cbpp.org/blog/disability-insurance-provides-vital-benefits-to-vulnerable-workers

Living Wage Calculation for Milwaukee County, Wisconsin, accessed July 7, 2022, https://livingwage.mit.edu/counties/55079

Melissa Linebaugh, "How Much in Social Security Disability Benefits Can You Get?" NOLO, January 10, 2022, https://www.nolo.com/legal-encyclopedia/how-much-social-security-disability-ssdi-benefits-can-you-get.html

Nanette Goodman et al., "The Extra Costs of Living with a Disability in the U.S. — Resetting the Policy Table," National Disability Institute, October 2020, https://www.nationaldisabilityinstitute.org/reports/extra-costs-living-with-disability/

"Plain Language Summary of Recent Changes to Wisconsin Unemployment Insurance Law," PDF file, 2015. **https://dwd.wisconsin.gov/uibola/pdf/plainlang2015.pdf**

Rebecca Vallas, Shawn Fremstad, "Social Security Disability Insurance: A Bedrock of Security for American Workers," Center for American Progress, June 16, 2015. https://www.americanprogress.org/article/social-security-disability-insurance-a-bedrock-of-security-for-american-workers/

Shawn Fremstad, "The Defining Down of Economic Deprivation: Why We Need to Reset the Poverty Line," The Century Foundation, September 30, 2020, https://tcf.org/content/report/defining-economic-deprivation-need-reset-poverty-line/

Social Programs that Work, "Nevada's Reemployment and Eligibility Assessment Program," May 27, 2020, https://evidencebasedprograms.org/programs/nevadas-reemployment-and-eligibility-assessment-program

Social Security Administration, Frequently Asked Questions, "Will my disability benefits be reduced if I get workers' compensation or other public disability benefits?" February 4, 2022, https://faq.ssa.gov/en-us/Topic/article/KA-01831

Social Security Administration, Master Beneficiary Record, June 2020, https://www.ssa.gov/OACT/ProgData/benefits/da_mbc202006.html

Social Security Administration, Monthly Statistical Snapshot, January 2022, https://www.ssa.gov/policy/docs/quickfacts/stat_snapshot/2022-01.html.

Social Security Administration, "National Beneficiary Survey," 2018 https://www.ssa.gov/disabilityresearch/nbs.html

Social Security Administration, Trial Work Period, accessed July 7, 2022, https://www.ssa.gov/oact/cola/twp.html/

Social Security Administration, "What is the Ticket to Work Program?" Accessed July 7, 2022, https://choosework.ssa.gov/about/

Social Security Administration, "What You Need to Know About the Trial Work Period," March 11, 2021, https://choosework.ssa.gov/blog/2021-03-11-what-you-need-to-know-about-the-trial-work-period-twp

United States Department of Labor, Monthly Program and Financial Data, May 2022,
https://oui.doleta.gov/unemploy/claimssum/5159report.asp

William R. Morton, "Ticket to Work and Self-Sufficiency Program: Overview and Current Issues," Congressional Research Service, September 13, 2013,
https://sgp.fas.org/crs/misc/R41934.pdf

2020 Poverty Guidelines, ASPE: U.S. Department of Health and Human Services, 2020,
https://aspe.hhs.gov/topics/poverty-economic-mobility/poverty-guidelines/prior-hhs-poverty-guidelines-federal-register-references/2020-poverty-guidelines

**Prior Publications**

**Mr. Andrew Stettner**

Stettner, A., *Community Colleges Collaborate to Advance Racial Equity in Manufacturing* (May 17, 2022). The Century Foundation,
https://tcf.org/content/report/community-colleges-collaborate-to-advance-racial-equity-in-manufacturing/

Stettner, A., *SSBCI 2.0: A New Capital Tool for Revitalizing and Diversifying Manufacturing* (January 21, 2022). The Century Foundation,
https://tcf.org/content/report/ssbci-2-0-new-capital-tool-revitalizing-diversifying-manufacturing/

Stettner, A., *7.5 Million Workers Face Devastating Unemployment Benefits Cliff This Labor Day* (August 5, 2021). The Century Foundation,
https://tcf.org/content/report/7-5-million-workers-face-devastating-unemployment-benefits-cliff-labor-day/

Stettner, A., *Promoting a Rapid, Equitable Economic Recovery from COVID-19 for New York City* (July 22, 2021). The Century Foundation,
https://tcf.org/content/report/promoting-rapid-equitable-economic-recovery-covid-19-new-york-city/

Stettner, A., *Industry and Inclusion: A Blueprint for Action* (June 22, 2021).The Century Foundation,
https://tcf.org/content/report/industry-inclusion-blueprint-action/

Stettner, A., *12 Million Workers Facing Jobless Benefit Cliff on December 26* (November 18, 2020). The Century Foundation, https://tcf.org/content/report/12-million-workers-facing-jobless-benefit-cliff-december-26/

Stettner, A., *Promises Unfulfilled: Manufacturing in the Midwest* (October 8, 2020). The Century Foundation,
https://tcf.org/content/report/promises-unfulfilled-manufacturing-midwest/

Stettner, A., *Centuring Workers — How to Modernize Unemployment Insurance Technology* (October 5, 2020). The Century Foundation,
https://tcf.org/content/report/centering-workers-how-to-modernize-unemployment-insurance-technology/

Stettner, A., *Moving Michigan Forward: Public Higher Education Finance Reforms to Bring College within Reach* (June 8, 2020). The Century Foundation,
https://tcf.org/content/report/moving-michigan-forward-public-higher-education-finance-reforms-bring-college-within-reach/

Stettner, A., *How to Respond to Job Losses from Technology, Trade, and Policy Choices* (October 1, 2019). The Century Foundation https://tcf.org/content/report/respond-job-losses-technology-trade-policy-choices/

Stettner, A. and Yudken, J.S., "Policies and Strategies for Revitalizing America's Manufacturing Communities." (2019) *Journal of Management Policy & Practice*, *20*(4)
http://m.www.na-businesspress.com/JMPP/JMPP20-4/6_StettnerA_20_4_.pdf

Stettner, A., *Revitalizing Manufacturing and Expanding Opportunities for Chicago's Black and Latino Communities* (June 6, 2018). The Century Foundation,

https://tcf.org/content/report/revitalizing-manufacturing-expanding-opportunities-chicagos-black-latino-communities/

Stettner, A., *Mounting a Response to Technological Unemployment* (April 26, 2018). The Century Foundation, https://tcf.org/content/report/mounting-response-technological-unemployment/

Stettner, A., *Unemployment Trust Fund Recovery is Helping Employers, not Workers* (December 7, 2017). The Century Foundation, https://tcf.org/content/report/unemployment-trust-fund-recovery-helping-employers-not-workers/

Stettner, A., *Revitalizing America's Manufacturing Communities* (October 16, 2017). The Century Foundation, https://tcf.org/content/report/revitalizing-americas-manufacturing-communities/

Stettner, A., *Why Manufacturing Jobs are Worth Saving* (June 13, 2017). The Century Foundation, https://tcf.org/content/report/manufacturing-jobs-worth-saving/

Stettner, A., *Federal Wage and Hour Policies in the Twenty-First Century Economy* (February 16, 2017). The Century Foundation, https://tcf.org/content/report/federal-wage-hour-policies-twenty-first-century-economy/

Stettner, A., *A New Safety Net for An Era of Unstable Earnings* (December 15, 2016). The Century Foundation, https://tcf.org/content/report/new-safety-net-for-an-era-of-unstable-earnings/

Stettner, A., *Quality Jobs, Quality Child Care* (June 13, 2016). The Century Foundation, https://tcf.org/content/report/quality-jobs-quality-child-care/

Stettner, A., *Speeding the Recovery Unemployment Insurance* (March 29, 2016). The Century Foundation, https://tcf.org/content/report/speeding-the-recovery-of-unemployment-insurance/

Stettner, A., *Supporting Latino Community College Students: An Investment in Our Economic Future.* (2013). Excelencia in Education, https://files.eric.ed.gov/fulltext/ED571545.pdf

Stettner, A. Smith, R., & McHugh, R., Unemployment insurance and voluntary quits. *Challenge*, (2003) *46*(3), 89-107.

**Ms. Rebecca Vallas**

Vallas, R., Knackstedt, K., Brown, H., Cai, J., Fremstad, S., & Stettner, A. *Economic Justice Is Disability Justice,* (April 2022), The Century Foundation, https://tcf.org/content/report/economic-justice-disability-justice/

Vallas, R., *A Progressive Agenda to Cut Poverty and Expand Opportunity* (June 2016). Center for American Progress, https://americanprogress.org/wp-content/uploads/2016/06/RoadmapOpportunity-report.pdf

Vallas, R., *Disabled Behind Bars: The Mass Incarceration of People With Disabilities in America's Jails and Prisons* (July, 2016). Center for American Progress, https://americanprogress.org/wp-content/uploads/2016/07/2CriminalJusticeDisability-report.pdf

Vallas, R., Fremstad, S., & Ekman, L.  *A fair shot for workers with disabilities.* Washington: Center for American Progress, https://www.americanprogress.org/article/a-fair-shot-for-workers-with-disabilities/

Vallas, R., *A Subsidized Jobs Program for the 21st Century: Unlocking Labor-Market Opportunities for all who Seek Work* (2015). Center for American Progress, https://www.americanprogress.org/article/a-subsidized-jobs-program-for-the-21st-century/

Vallas, R., *One Strike and You're Out*: *How We Can Eliminate Barriers to Economic Security and Mobility for People with Criminal Records* (December, 2014). Center for American Progress, https://americanprogress.org/wp-content/uploads/2014/12/CriminalRecordsReport-INTRO.pdf

Vallas, R., *Supplemental Security Income for Children with Disabilities* (November 6, 2012). National Academy of Social Insurance, Available at SSRN: https://ssrn.com/abstract=2375341

Vallas, R.,  "Children's SSI Disability Benefits at Risk Again." *Clearinghouse Review,* vol. 46, no. 1-2, May-June 2012, pp. 61-69. *HeinOnline*, https://heinonline.org/HOL/P?h=hein.journals/clear46&i=63.

Vallas, R., & Patel, R. (2012) Sentenced to a Life of Criminal Debt-A Barrier to Reentry and Climbing out of Poverty. *Clearinghouse Rev.*, 46, 131.
https://heinonline.org/HOL/LandingPage?handle=hein.journals/clear46&div=24&id=&page=

**Prior Expert Witness Statements**

Mr. Stettner
Ohio Supreme Court, *State ex rel. Bowling v. DeWine*, 2021-Ohio-2902
Florida Circuit Court, *Gia Cuccaro, et al. v. Ron Desantis*, 2021-CA-1413

**Rates**

$200 per hour for Ms. Vallas and Mr. Stettner


Sincerely,

*[signature]* 7/13/2022                    *[signature]* 7/13/2022

Andrew Stettner                             Rebecca Vallas
Sr. Fellow                                  Sr. Fellow