FILED
11-09-2023
Anna Maria Hodges
Clerk of Circuit Court
2023CV003790

STATE OF WISCONSIN        CIRCUIT COURT        MILWAUKEE COUNTY
BRANCH 44

_____

James A. Trandel, *Plaintiff*,

          v.                                          *Case No. 2023 CV 3790*

Labor and Industry Review Commission,
Department of Workforce Development, *Defendants*

_____

### Plaintiff's brief

_____

### Issues for review

- Does Wis. Stat. § 108.04(12)(f) ban eligibility for unemployment benefits when a person is being paid Social Security Disability Insurance ("SSDI") benefits?

- Are SSDI recipients like Mr. Trandel disabled individuals?

- Does Wis. Stat. § 108.04(12)(f) discriminate against disabled individuals?

- Is discrimination against a protected class—disabled workers—legally allowed under Wisconsin and federal unemployment law and the equal protection clause?

- Does discrimination against disabled workers by denying them eligibility for unemployment benefits when those disabled workers receive SSDI benefits serve a rational purpose pursuant to unemployment law?

### Facts

      Mr. Trandel has been a double amputee paraplegic for decades, Tr.15:17-25, and has been receiving SSDI benefits since the year 2000, outside of around two years, Tr.15:9-16.[1] For the last several years, he has worked for the Milwaukee Brewers as a gate supervisor for home games. Tr.29:1-16. As the Brewers do not play during the winter months, the claimant is laid off during those months. Id.

_____

[1] References to the 11 April 2023 hearing transcript, Doc.36 in the court record, will be in the form of Tr., followed by page and line numbers. There are numerous typographical errors with the transcript that should be ignored. *See*, e.g., Tr.2:22-3 (Mr. Trandel listed as representing the Department), Tr.10:*passim* (Trandel spelled as "Trendel"). Please note as well that Ex.1 and Ex.2 are included in Doc.36. Where relevant, references to the administrative record, found in Doc.29 to Doc.33 of the court record, will be in the form of Doc.##, followed by the page number in the court record.

On 27 December 2022, Mr. Trandel filed an initial claim for regular unemployment benefits, Ex.1 at Doc.36:49-51, with the assistance of Department staff. Tr.12:21-5 to 13:1-19. On this initial claim, Ex.1 at Doc.36:51, the claimant reported receiving SSDI benefits. Tr.14:13-25 to 15:1-8.

**<u>Procedural History</u>**

In Initial Determination 220369674 dated 12/29/2022, Doc.30:30, the Department found that the claimant was ineligible for regular unemployment benefits because of his receipts of SSDI benefits. There was a timely appeal, Doc.30:32, but then a lengthy delay before a hearing was scheduled in this matter, Doc.30:26 (hearing notice).[2]

After the hearing on 11 April 2023, the appeal tribunal affirmed the initial determination in a decision dated that same day, finding the following facts and legal conclusions:

> The claimant initiated a claim for unemployment insurance benefits on December 27, 2022. He has received Social Security Disability payments for over 20 years and he reported receiving the payments on his claim.
>
> * * *
>
> It is undisputed that the claimant has received social security disability benefits for over 20 years. He is likely to receive these benefits in perpetuity. The claimant's receipt of a monthly payment of disability benefits from Social Security renders him ineligible and disqualifies him for regular unemployment benefits under current Wisconsin law. While this decision is adverse to the claimant, the appeal tribunal must follow the law as it is written.

Doc.7:2 and Doc.29:21.

After a timely petition for review, Doc.27:17, with reference to Ex.2, Doc.36:52-76 and Doc.6, as to why a denial of eligibility because of SSDI benefits was illegal, the Commission affirmed the appeal tribunal in a decision dated 5 May 2023, writing:

> The commission has considered the employee's various arguments but does not find them persuasive. Wisconsin Stat. § 108.04(12)(f)3.a. provides, in relevant part, "an individual is ineligible for benefits under this chapter for each week in the entire month in which a social security disability insurance payment is issued

---

[2]  Additional appeals of initial determinations concerning late weekly certifications were also scheduled for the same hearing date and time. The appeal tribunal reversed those other initial determinations. As these issues are not relevant to the legal questions concerning the SSDI eligibility ban at stake here, the Commission has not included those initial determinations and appeal tribunal decisions concerning these other matters in the administrative record of this case.

> to the individual." Although the claimant has since challenged the enforceability
> of the aforementioned statutory provision in a pending federal class action, the
> commission must still follow the statutory provision as it is written.

Doc.8:2 and Doc.29:3.[3] Court review was subsequently sought. Doc.3. The Department moved

to dismiss the complaint for failing to state a claim, Doc.11, and the Commission joined in that

motion, Doc.15. After briefing, Doc.18 and Doc.22, the court orally denied these motions on

August 28, 2023.[4]

### Standard of Review

Pursuant to Tetra Tech EC, Inc. v. DOR, 2018 WI 75 ¶84, 382 Wis.2d 496, 914 N.W.2d

21, state agencies receive no deference except that due weight will be given to their experience,

technical competence, and specialized knowledge. Without elaborating on its reasoning, the

court in Tetra Tech concluded that this standard applies equally to the Commission in the cases it

seeks to defend in court. Id. at ¶53, n.30 (to the extent that Borgnis v. Falk Co., 147 Wis. 327,

359, 133 NW. 209 (1911) may have touched on deference to the Commission for its legal

interpretations, it is over-ruled).[5] As such, courts exercise their independent judgment to

determine their own conclusions about what the law in question should mean. Furthermore, state

agencies are prohibited from making any claims for any deference for their legal interpretations.

*See* Wis. Stat. § 227.10(2g) ("No agency may seek deference in any proceeding based on the

agency's interpretation of any law.").

In regards to the Commission's factual findings, a reviewing court will uphold those

findings if they are supported by credible and substantial evidence. Wis. Stat. § 108.09(f) (re-

enacting Wis. Stat. § 102.23(6) for judicial review of unemployment cases). Evidence is

"credible and substantial" if that evidence is "relevant, probative, and of a nature that it was not

---

[3]  It should be noted that the reference in the Commission decision here to Mr. Trandel being
part of a federal class-action challenging the SSDI eligibility ban is mistaken, as Mr. Trandel is
not part of any federal class action case concerning the SSDI eligibility ban, and no class has
yet been certified in that case. *See* docket for Bemke v. Pechecek, Case No. 21-cv-00560.

[4]  A transcript has been requested but is not yet available.

[5]  The question of whether due weight is even available to Commission decisions in
unemployment matters, *see* Catholic Charities Bureau, Inc. v. LIRC, 2023 WI App 12 ¶19 n.9,
*cert. granted*, and Amazon Logistics, Inc. v. LIRC, 2023 WI App 26 ¶¶21-4, *cert. granted*, is
not at issue here, as this case concerns a sharp departure from prior Commission decision-
making.

completely discredited as a matter of law by other uncontrovertible facts," and, "when most favorably viewed, ... [would] justify persons of ordinary reason and fairness to reach a conclusion based upon it." DWD v. LIRC (Dunham Express Corp.), 2010 WI App 123 ¶5 (2010) (reversing Commission finding that contract delivery drivers were not employees because the Commission misapplied the relevant legal tests), *quoting* Princess House, Inc. v. DILHR, 111 Wis.2d 46, 53-4, 330 N.W.2d 169 (1983).  As the Wisconsin Supreme Court explained:

> The question is not whether there is evidence to support a finding that was not made, but whether there was evidence to support a finding that was, in fact, made by the commission.

Brickson v. DILHR, 40 Wis.2d 694, 699, 162 N.W.2d 600 (1968).

In examining the factual record, a reviewing court should: (1) not take up the fact-finding work that the Commission itself should be doing, and (2) examine the record to determine if the Commission's actual factual findings have a reasonable basis from the evidence in the record. Kannenberg v. LIRC, 213 Wis.2d 373, 384, 571 N.W.2d 165, __ (Ct. App. 1997) (the reviewing court's role is to search the record to locate credible evidence, which supports the commission's determination, rather than weighing the evidence opposed to it).  "The assumption in that test is, of course, that the evidence is relevant, that it is evidentiary in nature and not a conclusion of law, and that it is not so completely discredited by other evidence that a court could find it incredible as a matter of law." Valadzic v. Briggs & Stratton Corp., 92 Wis.2d 583, 592, 286 N.W.2d 540, 544 (1979), *quoting* Adm. T. Madden, Inc. v. ILHR Dept., 43 Wis.2d 528, 547, 169 N.W.2d 73, 82 (1969); *see also* Wis. Stat. § 108.09(7)(f) (a reviewing court "shall not substitute its judgment for that of the commission as to the weight or credibility of the evidence on any finding of fact" but  may "set aside the commission's order or award and remand the case to the commission if the commission's order or award depends on any material and controverted finding of fact that is not supported by credible and substantial evidence").

Regardless of any factual dispute, the application of law to facts remains a question of law for the court to decide in the first instance. In Easterling v. LIRC, 2017 WI App 18, 374 Wis.2d 312, 893 N.W.2d 265, for example, the court based its decision on whether there was factual evidence in the record to support the Commission's legal conclusion that substantial fault had occurred. As such, the question for the court was:

> whether there is credible and substantial evidence in the record on which
> reasonable persons could rely to decide that Easterling's failure to secure the
> wheelchair was an inadvertent error as opposed to an intentional act.

Easterling at ¶11 (and finding, id. at ¶¶17-21, that the evidence in the record describes an

accidental mistake and so does NOT qualify as substantial fault). Given the changes to agency

deference—i.e., none—declared in Tetra Tech and then further limited by statute, this court

makes its own conclusions without regard to the Commission's own legal reasoning when

applying unemployment law to the facts in the record.

## **Argument**

A. **The Commission, the appeal tribunal, and Wisconsin law hold that Wis. Stat.
   § 108.04(12)(f) is an SSDI eligibility ban.**

Wis. Stat. § 108.04(12)(f) states:

> 1m. The intent of the legislature in enacting this paragraph is to prevent the
> payment of duplicative government benefits for the replacement of lost
> earnings or income, regardless of an individual's ability to work.

> 2m. In this paragraph, "social security disability insurance payment" means
> a payment of social security disability insurance benefits under 42 USC ch.
> 7 subch. II.

> 3.    a. Except as provided in subd. 3. b. to d., an individual is ineligible
> for benefits under this chapter for each week in the entire month in
> which a social security disability insurance payment is issued to the
> individual.

> b. In the first month a social security disability insurance payment is
> first issued to an individual, the individual is ineligible for benefits
> under this chapter for each week beginning with the week the social
> security disability insurance payment is issued to the individual and
> all subsequent weeks in that month.

> c. Following a cessation of social security disability insurance
> payments to an individual and upon the individual again being
> issued a social security disability insurance payment, the individual
> is ineligible for benefits under this chapter for each week beginning
> with the week the social security disability insurance payment is
> issued to the individual and all subsequent weeks in that month.

> d. Following cessation of social security disability insurance
> payments, an individual may be eligible for benefits under this
> chapter, if otherwise qualified, beginning with the week following

>the last Saturday of the month in which the individual is issued his
>or her final social security disability insurance payment.
>
>4. Information that the department receives or acquires from the federal
>social security administration regarding the issuance of social security
>disability insurance payments is considered conclusive, absent clear and
>convincing evidence that the information was erroneous.

The appeal tribunal concluded that "as of week 53 of 2022, the employee did actually receive

social security disability insurance payments, within the meaning of Wis. Stat. § 108.04(12)(f)

and is therefore ineligible for unemployment insurance benefits." Doc.7:3 and Doc.29:21. The

Commission likewise held: "The commission affirms the appeal tribunal decision. Accordingly,

the claimant is ineligible for benefits beginning in week 53 of 2022," Doc.8:1 and Doc.29:2,

because "Wisconsin Stat. § 108.04(12)(f)3.a. provides, in relevant part, 'an individual is

ineligible for benefits under this chapter for each week in the entire month in which a social

security disability insurance payment is issued to the individual,'" Doc.8:2 and Doc.29:3.

As held by the Commission, Wis. Stat. § 108.04(12)(f) is an SSDI eligibility ban, and not

an offset, not even an offset of 100%.[6] As enacted and as applied, this SSDI eligibility ban in

---

[6]  Beginning in the 1980s, states have been allowed to deduct or offset the actual amount of
Social Security benefits a person receives from the actual amount of unemployment benefits
due that person in a given week, and such general offsets against any and all Social Security
benefits were then enacted. In light of growing public opposition, those general offsets were
subsequently repealed, and it is unclear whether any state still applies such a general offset.
Indeed, current guidance from the US Dep't of Labor, "Ch.5, Nonmonetary Eligibility," (2022)
(https://oui.doleta.gov/unemploy/pdf/uilawcompar/2022/nonmonetary.pdf) at 50, states that
"Social Security payments are not considered deductible income."

While there are court challenges to offsets of SSDI benefits against unemployment benefits,
*see* Virginia Emp. Comm'n v. Nunery, 24 Va. App. 617, 484 S.E.2d 609 (1997), and Cericalo
v. Indus. Claim Appeals Off. of State of Colo., 114 P.3d 100 (Colo. App. 2005), it unknown if
any state still applies an actual SSDI offset to a person's weekly unemployment benefit. There
is no longer an SSDI offset in Virginia, Va. Code § 60.2-604 ("in consideration of the
employee's contributions thereto, the weekly benefit amount payable to an individual for any
week shall not be reduced by any amount of Social Security Act"), or Colorado, which now
only provides that SSDI eligibility qualifies a person for a waiver of an over-payment of
unemployment benefits. *See* Colo. Rev. Stat. § 8-81-101(4)(a)(I)(a).

Currently, North Carolina is the only other state with an SSDI eligibility ban. *See* NC § 96-
14.9(c), as enacted via N.C.S.L. 2013-2 § 5 (19 Feb. 2013):

>(c) Able to Work.–An individual is not able to work during any week that the
>individual is receiving or is applying for benefits under any other state or federal
>law based on the individual's temporary total or permanent total disability.

Wisconsin unemployment law holds that any disabled person receiving SSDI benefits is ineligible for any unemployment benefits, Wis. Stat. § 108.04(12)(f)3.a, regardless of that person's actual ability to work, Wis. Stat. § 108.04(12)(f)1m.

**B.  SSDI recipients are disabled individuals.**

The Social Security Administration defines a disabled person as someone who (A) cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months; or (B) in the case of an individual who has attained the age of 55 and is blind . . ., [and cannot] by reason of such blindness . . . engage in substantial gainful activity in which he has previously engaged with some regularity and over a substantial period of time." 42 USC § 423(d)(1). A "'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 USC § 423(d)(3). "Substantial gainful activity is work activity that is both substantial and gainful." 20 CFR § 416.972. Substantial work requires "doing significant physical or mental activities." 20 CFR § 416.972(a). Gainful work is work which is done for pay or profit.  20 CFR § 416.972(b).[7]

Mr. Trandel is a double amputee paraplegic, and so he is a disabled person. *See* Social Security Program Operations Manual System, TN 26 (07-21), DI 34001.010 Musculoskeletal Disorders, 101.00 Musculoskeletal Disorders (Effective Date 07/23/21) (https://secure.ssa.gov/poms.nsf/lnx/0434001010) (setting forth the medical criteria and process for determining whether an amputated limb qualifies as a disability for an adult); *see also* 20 CFR § 416.925 (directions for how to use listing of impairments in Appendix 1), and 20 CFR § Appendix 1 to Subpart P of Part 404 (listing of impairments). Because his disability now prevents him from engaging in substantial gainful activity, the Social Security Administration

---

[7]  In Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 96 (1999), the U.S. Supreme Court analyzed whether an individual who received SSDI benefits could also have a workplace discrimination claim pursuant to the ADA. The court held that such a claim existed because receipt of SSDI benefits did not necessarily mean an individual could not work. Id. at 802-3. The court provided a lengthy description of how the SSDI approval application was administered and the factors used to determine disability for purposes of SSDI coverage. Id. at 802-5.

has concluded that his disability qualifies him for receiving SSDI benefits, even though he regularly works each baseball season for the Milwaukee Brewers during their home games. Furthermore, because Mr. Trandel can neither walk nor stand, he has "a physical or mental impairment which substantially limits one or more of such person's major life activities." 29 USC § 705(20)(B)(i) (definition of disability for the Americans with Disabilities Act)[8]; *see also* Wingra Redi-Mix Inc. v. LIRC, 2023 WI App 34 ¶¶58-60 (describing that a permanent impairment that limits normal life functions, major life activities, or a capacity to work qualifies as a disability under Wisconsin discrimination law).

### C. The SSDI eligibility ban discriminates against disabled workers.

### 1. The discrimination.

The Department created the SSDI eligibility ban under the pretense that disabled people cannot work and so fraudulently "double-dip"[9] when claiming unemployment benefits.

> To understand why such "double-dipping" may constitute fraud, please note the following general requirements for each program:
>
> - To receive unemployment insurance benefit payments, claimants must state that they are able to work.
> - To receive disability insurance benefit payments, claimants must state that they are unable to work.
>
> Under certain circumstances, it is possible that some individuals may be eligible for concurrent cash benefit payments due to differences in DI and UI eligibility requirements. Differences in program rules and definitions allow individuals in certain circumstances to receive overlapping DI and UI benefits without violating eligibility requirements. The Social Security Administration's definition of a disability involves work that does not rise to the level of substantial gainful activity. In contrast, a state's determination of "able and available for work" criteria for UI benefits may include performing work that does not rise to the level of substantial gainful activity. As a result, some individuals may have a disability under federal law but still be able and available for work under state law, thus eligible to receive DI and UI.

---

[8]  The Rehabilitation Act also protects individuals who are "regarded as having such an impairment." 29 USC § 705(20)(B)(iii).

[9]  While "double-dipping" is a pejorative, the Department's arguments here mean that this term cannot be avoided. This pejorative for the SSDI eligibility ban is akin to a race-conscious eligibility ban based on the prejudice that black people are presumably so lazy as to not be able and available for work and so should be categorically ineligible for unemployment benefits.

*Yet, many of individuals currently receiving both unemployment insurance benefit payments and disability insurance payments do not fall within that narrow category and are therefore committing acts of fraud. In general, legitimate beneficiaries of these social safety net programs can draw funds from one program, or the other, but not both at the same time.*

D12-05 (16 Oct. 2012) at Doc.5:2-3 (emphasis supplied). In <u>Gary Kluczynski</u>, UI Hearing No. 14400214AP (30 May 2014) (https://lirc.wisconsin.gov/ucdecsns/4016.htm), Doc.19:5-11, the Commission explained at length how fundamentally wrong this misconception was.

- The SSDI eligibility ban presumes that disabled individuals cannot work, but current unemployment law already provided a mechanism for adjudicating able and available issues on a case by case basis for SSDI recipients.

- The Social Security Act's SSDI eligibility provision, 42 USC § 423(d)(2)A, determines that an individual is disabled when that person can no longer participate in substantial gainful activity, but does not hold that the individual can no longer work at all.

- Relevant Social Security law allows an individual to return to work that constitutes substantial gainful activity for a trial period of 15-18 months. 42 USC § 422(c); 20 CFR § 404.1592.

- The Social Security Administration encourages SSDI recipients to maintain connections to the labor market by offering vocational rehabilitation services through its Ticket to Work program. 42 USC § 1320b-19; 20 CFR Part 411.

- The Department's own rules on ability to work and availability for work clearly contemplate that a disabled individual may nevertheless be considered able and available for purposes of unemployment eligibility. Wisconsin Administrative Code § DWD 128.01(3) (despite a physical or psychological restriction a person can maintain an attachment to the labor market if he or she can engage in "some" gainful employment), Wis. Admin. Code § DWD 128.01(4) (a person shall not be considered unavailable for work solely because of an inability to work full-time, "provided the individual is available for suitable work for the number of hours the individual is able to work").

- There is no relationship between eligibility for SSDI benefits and benefit year eligibility for unemployment benefits. SSDI benefits are based on earnings over a career, and are funded in part by employee contributions, whereas unemployment benefits are based on earnings within a year-long base period, and are funded by employer contributions within the base period. And, the two programs have completely different schedules of benefits.

Kluczynski at Doc.19:9-11; *see also* Commission, "DWD Proposal D15-01 - Legal Red Flags" (Department SSDI proposal presents due process, equal protection, and discrimination concerns), Doc.19:1-4.

As detailed in Doc.6:16-21 and Doc.36:67-76, the Department disputed these facts and law from the Commission, and despite an additional memorandum by the Commission on the SSDI eligibility ban, Doc.19, proposed an amended version that made clear that disabled people who receive SSDI benefits should never get any unemployment benefits, because as originally stated in D12-5, disabled people cannot both work and be disabled. *See also* D15-01 (19 March 2015) at Doc.21:1 (collecting from both SSDI and unemployment "allows the claimant to collect benefits from two benefit programs designed to supplement lost earnings due to the claimant's inability to work"). Hence, the SSDI eligibility ban was revised to include this new provision:

> The intent of the legislature in enacting this paragraph is to prevent the payment of duplicative government benefits for the replacement of lost earnings or income, *regardless of an individual's ability to work*.

Wis. Stat. § 108.04(12)(f)1m (emphasis supplied) and D15-01 at Doc.21:3.

*There is no other provision of state unemployment law* that denies unemployment benefits completely to a class of people regardless of their ability to work, let alone members of a protected class. Outside of the SSDI eligibility ban, *only wages or benefits that replace wage income connected to benefit year employment or other unemployment benefits lead to an offset*. *See* Wis. Stat. §§ 108.04(12)(b), (c), and (d) (claimants ineligible for unemployment benefits in the same week they receive other unemployment benefits from Wisconsin, the federal government, or other states, respectively), Wis. Stat. § 108.04(12)(e) (claimants who receive workers' compensation benefits for a temporary total disability or a permanent total disability for an entire week are ineligible for unemployment benefits in that week, as they are receiving workers' compensation in lieu of wages; partial workers compensation weekly payments for a temporary total disability, a temporary partial disability, or a permanent total disability are treated as wages for calculating unemployment benefit eligibility for that week), Wis. Stat. § 108.05(5) (dismissal or termination pay treated as wages for determining partial eligibility for unemployment benefits), Wis. Stat. § 108.05(6) (certain back pay awards that are less than two years old against an employer from whom unemployment benefits were claimed by the employee are treated as wages for determining partial eligibility for unemployment benefits), and

Wis. Stat. § 108.05(7) (pension payments from a base period employer and on which income taxes were previously paid by the claimant—but not Social Security benefits themselves—lead to a wage offset/benefit reduction). So, for instance, when offsets are applied or eligibility denied completely because of workers' compensation benefits, it is because a claimant is receiving those workers' compensation benefits *when not working for that time period and those workers compensation benefits are being received in place of wages previously being paid to that person*.

The SSDI eligibility ban, on the other hand, explicitly excludes all unemployment benefits for disabled workers *who were working and continuing to look for new work despite not receiving any work-related, replacement wages at all*. The SSDI eligibility ban treats disabled workers who receive SSDI benefits (which are only available to disabled individuals) differently from non-disabled workers, who have no such restrictions on their unemployment eligibility, under the false presumption that disabled workers do not work. The Department is denying and segregating disabled workers from receiving full and equal participation in receiving unemployment benefits by assuming that SSDI benefits are statutorily equivalent to unemployment benefits, even though the Commission pointed out repeatedly to the Department that SSDI benefits are determined differently from unemployment benefits and serve a different purpose from unemployment benefits. Kluczynski at Doc.19:10-11, and "D15-01 - Legal Red Flags" at Doc.19:2-4 (an SSDI eligibility ban raises due process, equal protection, and discrimination concerns). The Commission also explained at the time that an SSDI eligibility ban was based on a mistaken stereotype of disabled individuals being incapable of working rather than examining each individual's able and available status under Wisconsin unemployment law.[10] Kluczynski at Doc.19:9-10, and "D15-01 - Legal Red Flags" at Doc.19:4 (SSDI benefits

---

[10] As to able and available unemployment requirements in Wisconsin, *see* Wis. Admin. Code §§ DWD 128.01(3) (claimant is "able" to work even with physical or psychological restrictions as long as there is available substantial gainful employment in suitable work), and DWD 128.01(4) (claimant is "available" for work even with physical or psychological restrictions that limit the claimant to less than 32 hours in a week, as long as the claimant is willing to work to the extent the claimant is capable of working). The Commission has applied these regulations in Rebecca Madsen, PUA Hearing No. 20613147MD (1 Nov. 2021) (https://lirc.wisconsin.gov/ucdecsns/4310.pdf), Tunisha Perkins, UI Hearing No. 11605816MW (11 Jan. 2012) (https://lirc.wisconsin.gov/ucdecsns/3698.htm), Kouimelis v. Dennys Restaurant 6318, UI Hearing No. 12201489EC (4 Dec. 2012) (https://lirc.wisconsin.gov/ucdecsns/3787.htm), and Wright v. Independence First Inc., UI Hearing No. 09607759MW (8 March 2010) (https://lirc.wisconsin.gov/ucdecsns/3452.htm).

calculated differently from unemployment benefits and serve a completely different purpose). The Department's explicit, non-neutral treatment of disabled workers based on a stereotype that disabled people do not work, and despite plentiful evidence to the contrary, is the very definition of intentional discrimination. *Cf.* Price Waterhouse v. Hopkins, 490 U.S. 228, 250 (1989) ("an employer who acts on the basis of a belief that a woman cannot be aggressive or that she must not be, has acted on the basis of gender") and Hively v. Ivy Tech Cmty. Coll. of Ind., 853 F.3d 339, 345-9 (7th Cir. 2017) (recognizing that sexual orientation is protected under the prohibition against sex discrimination in Title VII because stereotypes based on sex constitute discrimination because of sex).

> **2.   Discrimination against the disabled is illegal.**

Per UIPL No. 02-16 (1 Oct. 2015) (https://www.dol.gov/sites/dolgov/files/ETA/advisories/UIPL/2015/UIPL_02-16.pdf),[11] the US Dep't of Labor explained that the "when due" requirement in § 303(a)(1) of the Social Security Act, 42 USC § 503(a)(1), means that the anti-discrimination provisions in federal law apply to the unemployment claim-filing process.

> The nondiscrimination laws that apply to state UI agencies prohibit discrimination based on both disparate treatment—intentionally treating members of protected groups differently based on their protected status—and disparate impact—the use of policies or practices that are neutral on their face, but have a disproportionate impact on members of some protected groups.

UIPL No. 02-16 at 4. Pursuant to this program letter, directly denying eligibility based on a protected class is patently discriminatory.

> WIA and WIOA nondiscrimination regulations provide, in pertinent part, that covered entities "must not, directly or through contractual, licensing, or other arrangements, use *standards, procedures, criteria or administrative methods . . .* [t]hat have the *purpose or effect* of subjecting qualified individuals with

---

[11] UIPL stands for Unemployment Insurance Program Letter. The U.S. Dep't of Labor Employment and Training Administration, or DOLETA, issues program letters about how states are to administer various facets of unemployment law. These program letters as well as various handbooks are the regulatory framework for numerous unemployment issues, addressing everything from how state administration budgets are determined to the conduct of administrative law judges at unemployment hearings. A listing of all active program letters is at Training and Employment Notice ("TEN") No. 26-21 (24 May 2022) (https://www.dol.gov/agencies/eta/advisories/training-and-employment-notice-no-26-21).

disabilities to discrimination on the basis of disability." 29 CFR 37.7(e)(1) or 29
CFR 38.7(e)(1), as applicable.

UIPL No. 02-16 at 5 (emphasis in original). The SSDI eligibility ban sets forth the criteria by
which the Department is determining that disabled workers are not eligible for any
unemployment benefits, in violation of this explicit prohibition in this program letter to use
standards that have the purpose of subjecting qualified individuals with disabilities to
discrimination on the basis of their disability.

The Workforce Innovation and Opportunity Act ("WIOA"), Pub. L. 113-128, 128 Stat.
1425, *partially codified* at 29 USC ch.32, is intended to maintain the quality of government
services for "access to and opportunities for the employment, education, training, and support
services [the users of those services] need to succeed in the labor market," 29 USC § 3101(1),
and so the act amended or modified numerous provisions of federal law.[12] The regulatory
authority provided for under this act includes regulations to allow for compliance with these
provisions in a manner that avoids duplication of effort." 29 USC § 3248(e).

Per 29 USC § 3248(a), this act specifically prohibits discrimination based on disability,
defined at 29 USC §§ 794 and 705(20), for any program or activity administered by a state or
local government entity.[13] In the regulations for this act, disability is extensively defined, 29 CFR

---

[12] WIOA applies here, in part, because the administrative funding for the Department comes
from a federal unemployment tax called FUTA ("Federal Unemployment Tax Act") that
employers pay to the federal government. *See* 29 USC § 3251 ("Any funds received by a State
under this subchapter shall be subject to appropriation by the State legislature, consistent with
the terms and conditions required under this subchapter."). These funds are then divvied up
among the states and territories via a funding formula. The most recent funding information is
available in UIPL No. 13-23 (13 Sept. 2023)
(https://www.dol.gov/sites/dolgov/files/ETA/advisories/UIPL/2023/UIPL%2013-23/UIPL
%2013-23.pdf).

[13] As to what state laws can allow, federal regulations specifically declare that state laws cannot
violate these federal anti-discrimination requirements:

> **Effect of State or local law or other requirements.** The obligation to comply
> with the nondiscrimination and equal opportunity provisions of WIOA or this part
> are not excused or reduced by any State or local law or other requirement that, on
> a prohibited basis, prohibits or limits an individual's eligibility to receive any aid,
> benefit, service, or training; to participate in any WIOA Title I-financially assisted
> program or activity; to be employed by any recipient; or to practice any
> occupation or profession.

29 CFR § 38.24(a).

§§ 38.4(q) and (ff), and a prohibited basis of discrimination, 29 CFR § 38.12. Denying, limiting, restricting, segregating, treating or otherwise limiting disabled individuals from full and equal participation in the services being provided, 29 CFR § 38.12(a), or aiding or perpetuating a state agency in discriminating against disabled individuals, 29 CFR § 38.12(b), denying access to a state service or benefit because of other, permissibly separate or different programs or activities, 29 CFR § 38.12(c), using standards, procedures, criteria, or administrative methods to deny, defeat, or impair coverage and to discriminate against disabled individuals, 29 CFR § 38.12(e), and imposing eligibility criteria that screens out individuals with disability from full and equal participation in the service or benefit being provided, 29 CFR § 38.12(i), are all prohibited.

In light of this explicit statutory language and regulations, federal anti-discrimination law applies to the receipt of unemployment benefits.[14] As Wisconsin's SSDI eligibility ban denies all unemployment benefits to SSDI recipients, this law denies, limits, restricts, and segregates disabled individuals from full and equal participation in those unemployment benefits. 29 CFR § 38.12(a). The SSDI eligibility ban sets forth a standard for eligibility criteria to deny, defeat, or impair all unemployment coverage to disabled individuals and thereby discriminates against them, 29 CFR § 38.12(e), by imposing eligibility criteria that screens out individuals with disability from full and equal participation in the service or benefit being provided, 29 CFR § 38.12(i).

The anti-discrimination elements for disabled workers in WIOA are comparable if not identical to the requirements in the Americans with Disabilities Act and §504 of the Rehabilitation Act. Washington v. Ind. High Sch. Ath. Ass'n, 181 F.3d 840, 845 n.6 (7th Cir. 1999) ("Title II of the ADA was modeled after § 504 of the Rehabilitation Act; the elements of claims under the two provisions are nearly identical, and precedent under one statute typically

---

[14] The Commission has previously held that the anti-discrimination requirements in WOIA apply to Wisconsin unemployment. In Mohamoud M. Hussein v. Jennie-o Turkey Store Inc., UI Hearing No. 19200491EC (1 August 2019) (https://lirc.wisconsin.gov/ucdecsns/4221.pdf) and Gilberto Salinas, UI Hearing No. 19001182EC (1 August 2019) (https://lirc.wisconsin.gov/ucdecsns/4225.pdf), the Commission over-ruled prior decisions (that, when a person could not read English, it was that individual's responsibility to find someone who could explain a Department document to that individual) was no longer tenable in light of the 2014 requirements set forth in WIOA. As the Commission explicitly held in Hussein and Salinas, "Unemployment insurance programs are recipients covered under [these anti-discrimination] rule." Accordingly, the Department had to provide assistance to individuals with limited English proficiency by including the required Babel notice.

applies to the other").[15] First, a disabled person must still meet the eligibility requirements of the participating program to be a qualified individual. Id. at 849-50. Second, there must be a denial of some kind of participation in a government program, and third, that denial must be by reason of the individual's disability. Id. at 846.[16]

In Huston v. Comm'r of Empl. & Econ. Dev., 672 N.W.2d 606 (Minn. Ct. App. 2003), Doc.4, the court there held that a similar SSDI eligibility ban in Minnesota discriminated against disabled workers in violation of the Americans with Disabilities Act and the Rehabilitation Act.[17]

---

[15] The Rehabilitation Act applies to organizations which receive federal funds. Wis. Cmty. Servs. v. City of Milwaukee, 465 F.3d 737, 746 (7th Cir. 2006). Title II of the Americans with Disabilities Act applies to the denial of benefits arising from the services, programs, or activities of a public entity to disabled individuals by reason of their disability. Wagoner v. Lemmon, 778 F.3d 586, 592 (7th Cir. 2015). The prima facie case for discrimination is the same under the ADA and the Rehabilitation Act. See Jackson v. City of Chicago, 414 F.3d 806, 810 n.2 (7th Cir.2005) (noting that the only difference between the two claims is that federal funding must be shown in a Rehabilitation Act case).

[16] Where intentional discrimination against the disabled is not at issue, a plaintiff must show either a failure to provide a reasonable accommodation or a disproportionate impact on disabled people. Id. at 846-7.

[17] Minnesota law at the time contained a partial Social Security offset and a complete SSDI eligibility ban:

> (b) There shall be deducted from an applicant's weekly unemployment benefit amount 50 percent of the weekly equivalent of the primary social security old age or disability benefit the applicant has received, has filed for, or intends to file for, with respect to that week.

> (c) Regardless of paragraph (b), an applicant shall be ineligible for unemployment benefits for any week with respect to which the applicant is receiving, has received, or has filed for primary social security disability benefits. This paragraph shall not apply if the Social Security Administration approved the collecting of primary social security disability benefits each month the applicant was employed during the base period.

Minn. Stat. § 268.085, subd.4 (2002). As evident by this statutory language, a 50% offset applied to Social Security benefits in general, but a complete eligibility ban applied to those receiving SSDI benefits, unless a person had previously worked while also receiving SSDI benefits. Huston, 672 N.W.2d at 609, Doc.4:3-4. Those who applied for SSDI benefits but had yet to receive those benefits were subject to a complete eligibility ban, as they were not yet paid SSDI benefits while working.

In 2021, the 50% offset for Social Security benefits was repealed. 2021 Minn. Laws (1st special session) ch.10 art.4 § 9 (repealing subd.4), and a 50% offset for SSDI benefits in subd.4a was also

After reviewing the connection between disability and SSDI benefits, id. at 609-10, Doc.4:4-5, the court in Huston observed that the Minnesota SSDI eligibility ban held that a clamant was ineligible for unemployment benefits "based on a filing for a federal disability benefit where a determination as to his ability to work is not required," id. at 610, Doc.4:5. Because Minn. Stat. § 268.085, subd.4(c) created "an irrebuttable presumption that individuals who file for or receive SSDI benefits are unable to work" and that these individuals had no "opportunity to rebut that presumption, the Minnesota law effectively discriminate[d] against disabled individuals who file for or receive SSDI benefits but are also able to work." Id. at 610, Doc.4:5. As the Wisconsin SSDI eligibility ban presumes that SSDI recipients no longer work because of their disability, D12-05, Doc.5, and Wis. Stat. § 108.04(f)(12)1m, in the same manner as the Minnesota SSDI eligibility ban at issue in Huston, the reasoning in Huston should equally apply here to find that Wisconsin's SSDI eligibility illegally discriminates against disabled workers because of their disability. See also Racine Unified School Dist. v. LIRC, 164 Wis.2d 567, 605-6, 476 N.W.2d 707, 722 (Wis. App. 1991) (a proffered rationale that employees with AIDS/ARC posed a threat to to the safety of others was an unjustifiable, en masse rule that discriminates against disabled individuals, as there is no way to determine on a case-by-case basis whether a person with AIDS/ARC poses an actual safety risk).

### D. This discrimination against disabled workers does NOT provide equal protection under the law.

Equal protection of the law is guaranteed by the Fourteenth Amendment to the United States Constitution and by Article I, section 1 of the Wisconsin Constitution, and both provisions are handled similarly by Wisconsin courts. Milwaukee Cty. v. Mary F.-R., 2013 WI 92 ¶10, 351 Wis.2d 273, 839 N.W.2d 581, Funk v. Wollin Silo & Equipment, Inc., 148 Wis.2d 59, 61 n. 2, 435 N.W.2d 244, 245 n. 2 (1989).

---

repealed 2021 Minn. Laws (1st special session) ch.10 art.4 § 3. As of 2022, subd.4a bans receipt of unemployment benefits because of SSDI benefits except when a person has previously received SSDI benefits while working in their benefit year or a medical provider has certified the SSDI recipient as capable of working in suitable employment. See Minn. Stat. § 268.085, subd.4a. As such, Minnesota's SSDI eligibility ban currently has limited to no practical effect. Disabled workers who receive SSDI are still eligible for unemployment benefits because of their prior work or medical validation of their work status, and disabled individuals who do not work but who receive SSDI benefits do not qualify for unemployment benefits because of their lack of work (i.e., they lack sufficient earnings to establish a benefit year for qualifying for unemployment benefits).

While disability is a protected class for purposes of discrimination, it does not entail a fundamental right for which strict scrutiny is due when determining whether equal protection of the law has been violated. <u>City of Cleburne, Texas v. Cleburne Living Center</u>, 473 U.S. 432, 439-47, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Rational basis review, however, is not toothless.[18]

> This standard, we believe, affords government the latitude necessary both to pursue policies designed to assist the [disabled] in realizing their full potential, and to freely and efficiently engage in activities that burden the [disabled] in what is essentially an incidental manner. The State may not rely on a classification

---

[18] As explained in a concurring opinion by Justice Stevens (that Chief Justice Rehnquist joined):

> The term "rational," of course, includes a requirement that an impartial lawmaker could logically believe that the classification would serve a legitimate public purpose that transcends the harm to the members of the disadvantaged class. Thus, the word "rational"—for me at least includes elements of legitimacy and neutrality that must always characterize the performance of the sovereign's duty to govern impartially.
>
> * * *
>
> The Court must be especially vigilant in evaluating the rationality of any classification involving a group that has been subjected to a "tradition of disfavor [for] a traditional classification is more likely to be used without pausing to consider its justification than is a newly created classification. Habit, rather than analysis, makes it seem acceptable and natural to distinguish between male and female, alien and citizen, legitimate and illegitimate; for too much of our history there was the same inertia in distinguishing between black and white. But that sort of stereotyped reaction may have no rational relationship—other than pure prejudicial discrimination—to the stated purpose for which the classification is being made." <u>Mathews v. Lucas</u>, 427 U.S. 495, 520-521, 96 S.Ct. 2755, 2769, 49 L.Ed.2d 651 (1976) (Stevens, J., dissenting).

<u>City of Cleburne</u>, 473 U.S. at 453 (footnotes omitted) and n.6 (Stevens, J., concurring). Accordingly, the decision in <u>Mayo v. Wis. Patients Comp. Fund</u>, 2018 WI 78 ¶32, 383 Wis.2d 1, 914 N.W.2d 678, to over-rule <u>Ferdon ex rel. Petrucelli v. Wis. Patients Comp. Fund</u>, 2005 WI 125, 284 Wis. 2d 573, 701 N.W.2d 440 is limited to the proposition that some new kind of heightened rational basis review had been created in <u>Ferdon</u>. As evident in <u>City of Cleburne</u>, rational basis review remains the same as it has been, but reviewing courts applying this standard will recognize the real world consequences and applications of the challenged legislation when a disadvantaged class is targeted by the legislation in question. The proposals from the Department that led to the SSDI eligibility ban, D12-05 at Doc.5 and D15-01 at Doc.21, indicate that a singular purpose and intent to discriminate against disabled individuals was evident in this law.

whose relationship to an asserted goal is so attenuated as to render the distinction
arbitrary or irrational.

City of Cleburne, 473 U.S. at 446; *see also* Kallas Millwork Corp. v. Square D Co., 66 Wis.2d

382, 388, 225 N.W.2d 454, 458 (1975) (a classification only violates equal protection if it "is

arbitrary and has no reasonable purpose or reflects no justifiable public policy"). And so, a

zoning restriction against group housing for disabled individuals was struck down in City of

Cleburne as an irrational distinction between disabled and non-disabled based on nothing more

than irrational prejudice.

> the expressed worry about fire hazards, the serenity of the neighborhood, and the
> avoidance of danger to other residents fail rationally to justify singling out a home
> such as 201 Featherston for the special use permit, yet imposing no such
> restrictions on the many other uses freely permitted in the neighborhood.

City of Cleburne, 473 U.S. at 450. Similarly, there is no rational basis for justifying the denial of

unemployment benefits to disabled workers under the SSDI eligibility ban.

 The Wisconsin Supreme Court has identified five factors relevant to the equal-protection

analysis:

> (1) All classification[s] must be based upon substantial distinctions which make
> one class really different from another.
> (2) The classification adopted must be germane to the purpose of the law.
> (3) The classification must not be based upon existing circumstances only.
> (4) To whatever class a law may apply, it must apply equally to each member
> thereof.
> (5) That the characteristics of each class should be so far different from those of
> other classes as to reasonably suggest at least the propriety, having regard to the
> public good, of substantially different legislation.

State ex rel. Baer v. City of Milwaukee, 33 Wis.2d 624, 633, 148 N.W.2d 21, 25-6 (1967)

(bracketed material, citations, and ellipses omitted). Each of these criteria "must be satisfied to

sustain a legislative classification against an equal-protection attack." Funk, 148 Wis.2d at 63,

435 N.W.2d at 246. Because the SSDI eligibility ban explicitly relies on distinctions that have

nothing to do with employment and unemployment but instead are based on class attributes

outside of work experience—i.e., disability status—these five factors are not satisfied.

 First, the SSDI eligibility ban is not based on any unemployment-related distinctions

between classes of unemployed workers. The SSDI status of disabled individuals is wholly

unrelated to their unemployment status. Mr. Trandel works at Brewers' home games for every

baseball season and is laid off each winter when the baseball season ends. Unlike his non-

disabled co-workers, however, he is declared ineligible for unemployment benefits not for any job-related factor but because he is disabled and receiving SSDI benefits. The unemployed workers of Wisconsin are treated differently by the Department based on whether those workers are disabled or not, nothing more. Their ability to work and the specific reasons for their loss of work are immaterial and irrelevant to the SSDI eligibility ban. The only proffered relationship is the presumption that disabled people cannot actually work and so commit fraud when claiming unemployment benefits. *See* D12-05 at Doc.5:2-3 ("In general, legitimate beneficiaries of these social safety net programs can draw funds from one program, or the other, but not both at the same time"). As Mr. Trandel's work experience demonstrates that presumption has no factual basis.

Second, neither is the SSDI eligibility ban germane to the purpose of unemployment law. The ban explicitly ignores the actual ability of disabled individuals to do any work at all, and so an ability to work and reasons for why a disabled person is no longer working are simply irrelevant to the application and scope of the SSDI eligibility ban. Wisconsin unemployment law explicitly holds that any eligibility distinction must rationally accomplish what unemployment benefits are intended to do:

> Chapter 108 therefore requires that unemployment compensation benefits be provided to any eligible person considered to be unemployed, unless that individual falls within a disqualifying provision. . . . we must read the disqualifying language with the general purpose of ch. 108 in mind.

Leissring v. DILHR, 115 Wis.2d 475, 484, 340 N.W.2d 533, 537 (1983). So, in Leissring, 115 Wis.2d at 492-3, 340 N.W.2d at 540-1, a distinction between a teacher laid off completely and a teacher given token work in the fall as reasonable assurance was not economically rational. For the court, the teachers' financial needs were the same, but this distinction created an incentive for school districts to avoid their liability for unemployment compensation benefits and so was disallowed. Id. The same is true of the SSDI eligibility ban. When both disabled and non-disabled workers lose work through no fault of their own, the SSDI eligibility ban creates an incentive for Wisconsin employers to avoid their liability for unemployment compensation benefits by targeting layoffs on their disabled workers. Under this eligibility ban, disabled workers cannot receive unemployment benefits when receiving SSDI benefits. So, employers of

disabled workers avoid any charges to their unemployment accounts when laying off their disabled workers.

Third, the SSDI eligibility ban is based entirely on a disabled individual's SSDI status rather than his or her most recent employment and job loss. Such a distinction is based on a preexisting classification rather than application of relevant law to facts. *See* Frank A. Cristando (Chief Judge, Social Security Administration) "Receipt of Unemployment Insurance Benefits by Claimant Applying for Disability Benefits—INFORMATION" (15 Nov. 2006) and "Receipt of Unemployment Insurance Benefits by Claimant Applying for Disability Benefits—REMINDER" (9 Aug. 2010) ("The Court [in Cleveland v. Policy Management Systems Corp.] noted that, under the presumptions embodied in our five-step sequential evaluation process, a person can qualify for Social Security disability benefits even though he or she remains capable of performing some work. Similar logic applies to applications for unemployment benefits."). In Wisconsin, disabled persons receiving SSDI benefits can never become unemployment claimants regardless of their work history or whether their job loss is qualifying or disqualifying. *Cf.* Kallas Millwork, 66 Wis.2d at 393, 225 N.W.2d at 460 (the ability of legislators to make distinctions between classes does "not come to grips with the real problem presented—what factors distinguish the favored class so that it requires or deserves an immunity not accorded others who appear to be similarly situated").

Fourth, the SSDI eligibility ban is not applied equally to the unemployed, as it only applies to disabled workers when they lose work.[19] Non-disabled workers who cannot receive SSDI benefits will never be subject to the SSDI eligibility ban. Unlike an offset for workers compensation benefits or a pension payment in which those benefits/payments are being received in lieu of wages, *see* pp.10-11, *supra*, SSDI benefits are not intended to replace workplace wages but are a retirement benefit being paid immediately to an individual because of a disability.

_____

[19] Disabled workers who never apply for SSDI benefits are not subject to the SSDI eligibility ban at all, and disabled workers with pending SSDI applications are only subject to the SSDI eligibility when their SSDI benefits are first paid. *See* Wis. Stat. § 108.04(12)(f)3.b. The Department, however, usually backdates the SSDI eligibility ban to when the Social Security Administration backdates or approves the applicant's SSDI eligibility. Accordingly, legal appeals are needed. *See* Tywonna Laney, UI Hearing No. 20603261MW (14 Oct. 2020) (https://lirc.wisconsin.gov/ucdecsns/4261.pdf) (in contrast to Department actions, the claimant is eligible for unemployment benefits prior to her first receipt of SSDI benefits).

There is *no relationship between the calculation of SSDI benefits and UI benefits, much less a one-to-one correspondence*. SSDI is based on earnings over a career, and is funded in part by employee contributions; UI is based on earnings within a year-long base period, and is funded by employer contributions within the base period. The two programs have completely different schedules of benefits. An individual could be entitled to a very low monthly SSDI payment due to low career earnings, such as $100 per month, which could be far less than what the individual would receive in unemployment benefits. Nevertheless, the department proposes that the statute in question be interpreted as barring that individual from any unemployment eligibility on the belief that the claimant would be collecting "double" benefits. There is no assurance whatsoever that an individual would be spared the economic hazards of unemployment, and therefore would be outside the set of individuals intended to be helped by the unemployment insurance law, simply by virtue of his or her receipt of SSDI.

Kluczynski, Doc.19:11 (emphasis supplied).

Finally, the distinction between disabled and non-disabled at the heart of the SSDI eligibility ban, while stark, does not, as describe below, indicate a proper distinction intended for the public good. Rather, as happened in City of Cleburne, the distinction is based on nothing more than prejudice against the disabled. The eligibility ban being applied to disabled individuals is completely different from what non-disabled individuals experience, and, as discussed below, there is no justification for this separate and disparate treatment of the disabled.

### E.    The SSDI eligibility ban serves no rational purpose pursuant to Wisconsin unemployment law.

Mr. Trandel has established a *prima facie* case of discrimination: (1) he is disabled and thus a member of a protected class, (2) he has been denied participation in a government program by being declared ineligible for unemployment benefits, (3) that denial of unemployment eligibility is because of the SSDI benefits he receives based on his disability, and (4) those same unemployment benefits are available to non-disabled Wisconsinites. *See* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); *see also* Stoughton Trailers, Inc. v. LIRC, 2007 WI 105 ¶23, 303 Wis.2d 514, 735 N.W.2d 477. The burden then shifts to the Department to articulate a legitimate, nondiscriminatory reason for denying unemployment benefits to Mr. Trandel. McDonnell Douglas, 411 U.S. at 802. This proffered reason from the Department is neither non-discriminatory nor rational.

The actual impact of the SSDI eligibility ban does NOT meet a legitimate, important, and integral goal of the unemployment system. Under this eligibility ban, employers still pay

unemployment taxes on the wages paid to their disabled employees.[20] And, the unemployment trust fund accrues additional monies because these disabled employees are ineligible for the unemployment benefits due them for their work.[21] As such, the trust fund is being rebuilt off of the labor of the disabled, in direct contradiction of the concerns and objectives of unemployment law:

> Unemployment in Wisconsin is recognized as an urgent public problem, gravely affecting the health, morals and welfare of the people of this state. The burdens resulting from irregular employment and reduced annual earnings fall directly on the unemployed worker and his or her family. The decreased and irregular purchasing power of wage earners in turn vitally affects the livelihood of farmers, merchants and manufacturers, results in a decreased demand for their products, and thus tends partially to paralyze the economic life of the entire state. In good times and in bad times unemployment is a heavy social cost, directly affecting many thousands of wage earners. Each employing unit in Wisconsin should pay at least a part of this social cost, connected with its own irregular operations, by financing benefits for its own unemployed workers. Each employer's contribution rate should vary in accordance with its own unemployment costs, as shown by experience under this chapter.

Wis. Stat. § 108.01(1). As implemented by the Department, the SSDI eligibility ban has created an unemployment claim-filing system where workers (who are disabled and receiving SSDI benefits) are laid off but who then can never collect any unemployment benefits despite those layoffs. Yet, according to state unemployment law, unemployment is an "urgent public problem" and a "heavy social cost" that decreases the "purchasing power of wage earners" and affects the livelihood of nearly all groups in Wisconsin. Accordingly, the employing units in Wisconsin should pay their fair share of the social costs of these layoffs, by financing the benefits due from their "own irregular operations," i.e., paying a higher or lower insurance premium based on the unemployment experience of their workers. *Unemployment benefits are intended to stimulate*

---

[20] For a description of how the unemployment insurance benefits are financed through a payroll tax employers pay, *see* Legislative Fiscal Bureau, "Informational Paper #84, Unemployment Insurance System," (Jan. 2023) (https://docs.legis.wisconsin.gov/misc/lfb/informational_papers/january_2023/0084_unemployment_insurance_system_informational_paper_84.pdf) at 11-16 (financing unemployment insurance benefits and contribution financing) and 41-3 (mechanics of contribution financing over time).

[21] The impact of the SSDI eligibility ban has gone from no more than 50 individuals when the ban was first proposed, to 687 claimants when enforcement began, to 3,500 individuals by May 2015. *See* "SSDI and unemployment: recent developments" (5 June 2015) (https://wisconsinui.wordpress.com/2015/06/05/ssdi-and-unemployment-recent-developments/).

*consumer spending to the benefit of employers* (and so employers need to pay their unemployment insurance premiums based on their unemployment experience ratings) and to keep the unemployed from turning to charity. In light of this explicit statutory language, the SSDI eligibility ban makes no sense whatsoever, as employers can lay off their disabled workers without any consequences at all to those employers' experience ratings, and these workers then lack the unemployment benefits to ameliorate the consequences to consumer spending caused by these layoffs.[22]

Furthermore, conserving the unemployment trust fund is explicitly not a fundamental goal of unemployment benefits. Rather:

> A sound system of unemployment reserves, contributions and benefits should induce and reward steady operations by each employer, since the employer is in a better position than any other agency to share in and to reduce the social costs of its own irregular employment.

Wis. Stat. § 108.01(2). Using the 3,500 disabled claimants previously acknowledged by the Department for being denied unemployment benefits, *see* n.21, *supra*., and the average benefits paid to a claimant in Wisconsin of $3,542, *see* "2nd Quarter 2023 Summary Tables" (https://oui.doleta.gov/unemploy/data_summary/SummaryTables.pdf) at 3 (last checked 2 Nov. 2023),[23] the current impact of the SSDI eligibility ban on unemployment benefits not being paid to disabled workers is $12,397,000 a year. Accordingly, employers of disabled workers have no financial incentive at all to reduce the social costs of their own irregular employment, thereby magnifying the problems of unemployment generally rather than reducing those problems.

A general reference in <u>Brooks v. LIRC</u>, 138 Wis.2d 106, 111, 405 N.W.2d 705, 707 (Wis. App. 1987) to limiting benefit eligibility so as to conserve the unemployment trust fund does not alter this conclusion. While the fiscal integrity of a state's unemployment trust fund is certainly tied to changes in eligibility criteria, those changes must still be based on consideration of either past employment (how a benefit year is calculated, for example), a person's willingness

---

[22] As noted by the Commission in <u>Kluczynski</u> at Doc:19:18, SSDI benefits and unemployment eligibility are based on entirely different eligibility criteria. So, the idea that there are duplicate benefits at issue is not factual.

[23] For Wisconsin in the fourth quarter of 2015, the average benefits paid per initial claim were $3,801, significantly higher than in 2022. This data is available by checking for Wisconsin's quarterly data for 2015 at https://oui.doleta.gov/unemploy/data_summary/DataSum.asp.

to accept new work (i.e., satisfying able and available and work search requirements), or the reasons for a person's unemployment.[24] Employers' unemployment insurance tax rating is still adjusted for the unemployment experience of their employees. *See* n.20, *supra*. By denying unemployment eligibility to disabled workers, the SSDI eligibility ban has created an irrational loophole that undercuts the stated purposes of why unemployment benefits exist in the first place.

Regardless of this impact on employers, the Department will claim that the SSDI eligibility ban is intended to avoid supplementing a disabled person's SSDI benefits with unemployment benefits, i.e., to pay a person twice and so prevent "double-dipping" by the disabled. *See* Wis. Stat. § 108.04(12)(f)(1m) (this ban is "to prevent the payment of duplicative government benefits for the replacement of lost earnings or income"). As the Commission noted when the SSDI eligibility ban was proposed, however, SSDI benefits were entirely separate from and intended for a completely different purpose from unemployment benefits. And so, there is nothing "duplicative" between SSDI benefits and unemployment benefits. In California Human Resources Dept. v. Java, 402 U.S. 121, 131-32, 91 S.Ct. 1347, __, 28 L.Ed.2d 666, __ (1971), the Supreme Court held that the "when due" provision of the Social Security Act, 42 USC § 503(a)(1), requires payments of unemployment benefits as quickly as reasonably possible because: "The purpose of the Act was to give prompt if only partial replacement of wages to the unemployed, to enable workers 'to tide themselves over, until they get back to their old work or find other employment, without having to resort to' . . . welfare or private charity." That is, unemployment benefits are an immediate wage replacement to be paid as quickly as possible so

---

[24] Ohio Bureau of Employment Services v. Hodory, 431 U.S. 471, 493, 97 S.Ct. 1898, 1910, 52 L.Ed.2d 513 (1977) concerned whether a prohibition on unemployment eligibility for workers on strike was allowable. Spielmann v. Industrial Commission, 236 Wis. 240, 252, 295 N.W. 1, 7 (1940) concerned the question of whether an employer or the then commission ultimately decided claimant eligibility for workers on strike. Finally, 26 USC § 3304 provides various work-related criteria for when a claimant is entitled or denied eligibility for unemployment benefits, such as having reasonable assurance of continuing work in an educational institution, § 3304(a)(6), being ineligible to work when a person's immigration status does not provide a work authorization, § 3304(a)(14), or when a person refuses to cross a picket-line, § 3304(a)(5). As held in Leissring, denying unemployment eligibility for reasons that are unrelated to work and job separations are problematic and disallowed. Denying unemployment eligibility for those with long hair, for example, would certainly preserve the unemployment trust fund. But, such an exclusion would have no relationship to work or the reason why a person lost work and also have an obvious and disproportionate impact on women, since they generally have long hair.

Page 24 of 26

as to prevent a person from turning to public assistance or charity of some kind. SSDI benefits, on the other hand, are a retirement benefit being paid immediately because of disability (lacking the ability to engage in substantial gainful activity) and are based on a person's previous earnings over his or her lifetime. By law and by fact, unemployment and SSDI are <u>not</u> interchangeable social safety net programs, "D15-01 - Legal Red Flags" at Doc.19:3-4 ("The absolute ban on receipt of SSDI benefits does not allow for replacement of lost earnings or income as stated in the statement of legislative intent"), and, per <u>Java</u> and Wis. Stat. § 108.01(1), unemployment is not a social safety net program at all but is intended as a substitute wage to avoid reliance on social safety net programs.

In application, the SSDI eligibility ban likewise lacks a valid rationale. A denial of a benefit based on a stereotype that disabled workers cannot actually work at all is simply illegal discrimination against the disabled. In <u>P.F. v. Taylor</u>, 914 F.3d 467, 469 and 471 (7th Cir. 2019), *quoting* <u>Anderson v. Univ. of Wis.</u>, 841 F.2d 737, 740 (7th Cir. 1988), the 7th circuit court of appeals explained that "federal law 'forbids discrimination based on stereotypes about a handicap, but it does not forbid decisions based on the actual attributes of the handicap.'" Differential, individualized treatment of disabled individuals based on actual needs and the government services at issue is allowed, but categorical denial based on stereotypes is not. <u>Id</u>.; *see also* <u>Racine Unified School Dist.</u>, 164 Wis.2d at 602, 476 N.W.2d at 721 (the claim that an exclusionary policy towards those with AIDS/ARC not discriminatory was disingenuous, because the policy in question was a conclusive presumption that such persons were incapable of performing on the job). Because the SSDI eligibility ban is based on a categorical presumption that disabled people do not work regardless of their actual ability to work, it is directly and inherently discriminatory against disabled workers.

The SSDI eligibility ban treats disabled workers who receive SSDI benefits (which are only available to disabled individuals) differently from non-disabled workers, who have no such restrictions on their unemployment eligibility, under the presumption that disabled workers do not work. Through this eligibility ban the Department is denying and segregating disabled workers from receiving full and equal participation in receiving unemployment benefits by assuming that SSDI benefits are statutorily equivalent to or a substitute for unemployment benefits. As noted above, there is no rational basis for this presumption and stereotype of

disabled workers, and so the SSDI eligibility illegally discriminates and does not provide equal protection under the law. Accordingly, the Commission decision enforcing the SSDI eligibility ban is without or in excess of its powers and should be reversed by this court.

### **Conclusion**

For the reasons stated above, Mr. Trandel submits that the SSDI eligibility ban discriminates against disabled workers and serves no rational purpose pursuant to state unemployment law. Accordingly, he is eligible for regular unemployment benefits regardless of his disability and without regard to his status as a recipient of SSDI benefits.

Respectfully submitted
on behalf of <u>James A. Trandel</u>,

**Victor Forberger, Esq.**
<u>Electronically signed by Victor Forberger</u>
WI State Bar No. 1070634
2509 Van Hise Ave., Madison WI 53705
Telephone: 608-352-0138
Dated: <u>9 November 2023</u>         E-mail: <u>vforberger@fastmail.fm</u>

I certify that this brief is provided by the court's e-file system to all parties of record in this matter.

**Victor Forberger, Esq.**
<u>Electronically signed by Victor Forberger</u>
WI State Bar No. 1070634